UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DR. BENNIE GREEN, | § | |
| *Plaintiff*, | § | |
| | § | |
| vs. | § | CIVIL ACTION H-07-1115 |
| | § | |
| THE TEXAS A&M UNIVERSITY SYSTEM AND | § | |
| TEXAS A&M UNIVERSITY-KINGSVILLE, | § | |
| *Defendants*. | § | |

## MEMORANDUM AND RECOMMENDATION

This Title VII pay discrimination case is before the court on Texas A&M University – Kingsville's "no-evidence" motion for summary judgment (Dkt. 13) and a subsequent traditional motion for summary judgment (Dkt. 31).[1]  The court recommends that Texas A&M University – Kingsville's second motion be granted.[2]

## Background

The following facts are undisputed.[3]  Dr. Bennie Green is a black tenured professor of sociology at Texas A&M University – Kingsville (the University).  Green has worked at the University since 1972 when he was hired as a lecturer prior to completing his PhD.  He

---

[1]     The district court has referred this case to this magistrate judge for pretrial management. (Dkt. 6).

[2]     Because the University's second motion for summary judgment fully disposes of this case, the court terminates the first motion (Dkt. 13) as moot.  Counsel is reminded that while a "no evidence" summary judgment is authorized under Texas Rule of Civil Procedure 166a(i), there is no such thing under Federal Rule of Civil Procedure 56.

[3]     The parties have stipulated to the admissibility of all exhibits.  Defendant's motion, at 2; Plaintiff's response, at 2.

became an assistant professor in 1975, and was granted tenure in 1977.  In 1980 he was promoted to associate professor and he became a full professor in 1999.  Green is currently the only black, tenured, full professor on campus.

Green has sued the University for discrimination under Title VII, 42 U.S.C. § 2000e, alleging that he was paid less than his white colleagues.  Green's claim is limited to discrete pay-setting decisions by the University that occurred between May 26, 2005 and March 22, 2006.[4]  The faculty pay raise for the 2005-06 academic year effective September 1, 2005 is the only pay decision that occurred during the relevant time period.

The September 1, 2005 faculty pay raise had a constant component and a merit component.  The constant component was $750.00 for all faculty in the department of psychology and sociology, including Green.  Each faculty member in the department was awarded a percentage of the funds available for merit raises based on the faculty member's mean annual performance evaluation scores for the prior three years, 2002, 2003, and 2004.

Four factors are considered in annual performance evaluations:  (1) teaching performance; (2) research and scholarly activities; (3) professional growth and activities; and (4) non-teaching activities supportive of University programs.  The faculty member chooses a weight within a set range to be accorded each factor.  After the conclusion of the calendar year under review, during the evaluation period, the faculty member submits a report detailing his activities for the year.  The department chair, with input from the faculty

---

[4]     *See* Memorandum and Recommendation on defendant's partial motion for summary judgment, Dkt. 25, adopted by the district court, Dkt. 26.

member, determines a score of 1 to 7 for each factor.  The scores are weighed and then totaled to give an overall performance rating.  Thus, the highest possible rating is 7.

Green did not turn in his annual report for the 2004 evaluation.  Instead of using a 0 for his 2004 score for purposes of arriving at the mean annual evaluation score, Green's department chair, Dr. James Puckett, averaged Green's annual performance scores for 2002 and 2003 without considering his 2004 score. Green's mean score was the lowest in the department, and he received no merit raise.

In addition to annual performance evaluations, the University is required by state law[5] to perform post-tenure review of tenured faculty.  Green underwent post-tenure review in 2004.  Post-tenure review results were not a consideration in the September 1, 2005 raise for Green or any other faculty.  Nonetheless, Green contends in his response that his due process rights were violated when he was denied the right to appeal a negative post-tenure review assessment.[6]

Post-tenure review is a cumulative review of a tenured faculty member's past five years performance to facilitate continuing productivity and development.  A faculty member under review is required to submit a portfolio detailing his activities for the previous 5 year period.  The faculty member's department chair then uses the portfolio to make a positive or

---

[5]     *See* TEX. EDUC. CODE § 51.942.

[6]     The claim of denial of due process was the subject of Green's April 1, 2005 EEOC charge, but he did not file a lawsuit within 90 days of receiving a right to sue letter based on that charge.  Denial of due process was not raised in his March 22, 2006 EEOC charge that led to this lawsuit.

negative assessment of the faculty member's performance.  A negative assessment triggers the creation of a Triad Peer Review Committee and the creation of a development plan.

Puckett gave Green a negative post-tenure review assessment in May 2004.  When Green expressed a desire to appeal the assessment, Puckett informed him that an appeal must wait until after finalization of a development plan by the Triad Peer Review Committee.  In October 2004, the Triad Peer Review Committee created a development plan that included prohibiting Green from teaching intersession courses, a significant source of supplemental income to a faculty member's 9-month salary.[7]

In March 2005, Green took his objections to University Provost Dr. Kay Clayton.  Clayton determined that Green could appeal Puckett's May 2004 negative assessment.  In a letter dated March 23, 2005, Clayton informed Green that the October 2004 development plan would be set aside, and the restriction against his teaching of intersession courses lifted pending the outcome of the appeal.

Thereafter, Green objected to the composition of the post-tenure review appeals committee elected to hear his case.  Although policies established by the Faculty Senate require only that members of the review committee be tenured, Green insisted that the committee be composed only of faculty of equal rank to himself, *i.e.*, tenured full professors.

The University declined to reconstitute the committee, and Green refused to participate in the appeal process.  Finally, in April 2007, the interim chair of the psychology

---

[7]     Intersession courses are taught during winter, spring, and summer sessions outside of the usual semester schedule.

and sociology department, Dr. Sonny Davis,[8] reported to the Dean of the College of Arts & Sciences, Dr. Ronn Hy, that because Green refused to participate in creation of a development plan, appointment of a Triad Peer Review Committee appeared to be moot.  In protest of the review process, Green continues to refuse to cooperate in a creating a development plan or to submit annual performance evaluation materials.

On March 22, 2006, Green filed a charge with the EEOC alleging discriminatory pay.  He filed this lawsuit on April 3, 2007.[9]

## Summary Judgment Standards

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The  party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial.  *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001).  Dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the nonmoving party.  *In re Segerstrom*, 247 F.3d 218, 223 (5th Cir. 2001).  "An issue is material if its resolution could affect the outcome of the action."  *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.,* 290 F.3d 303, 310 (5th Cir. 2002).  If the movant meets this burden, "the nonmovant must go beyond the pleadings and designate

---

[8]     Puckett died March 17, 2006.

[9]     In 1987, Green filed an EEOC charge and a subsequent federal lawsuit alleging that the University failed to promote him to full professor because of his race.  He repeated the process in 1990.  Both lawsuits resulted in judgments against him.  Defendant's Exhibit 1.

specific facts showing that there is a genuine issue for trial." *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995)).

If the evidence presented to rebut the summary judgment is not significantly probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the nonmoving party. *Id.* at 255.

## Analysis

The process for analyzing summary judgment motions in employment discrimination cases is by now too familiar to warrant extended recitation. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-49 (2000), succinctly summarizes the appropriate inquiry:

> Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

The court must draw all reasonable inferences in favor of the non-movant, and disregard all evidence favorable to the moving party that the jury is not required to believe. *Id.* at 150-51. Trial courts should not treat discrimination differently than other ultimate questions of fact for purposes of Rule 50 or 56. *Id.* at 148.

In contrast to the faculty review process described above, the question before the court is fairly straightforward:  Did the University deny Green a merit raise on September 1, 2005 because he is black?  This is not a disparate impact case alleging that "facially neutral employment standards operated more harshly on one group than another."  *Chance v. Rice University*, 989 F.2d 179, 180 (5th Cir. 1993).  Nor is this a case of systemic racial bias, supported by statistical or anecdotal evidence of discrimination against other African-American faculty members.  *See, e.g., Siler-Khodr v. The University of Texas Health Science Center San Antonio*, 261 F.3d 542, 546-47 (5th Cir. 2001) (statistical studies showing wage disparity between genders presented jury question whether unequal pay was due to gender).  Rather, Green has presented this as a disparate treatment case, premised almost entirely upon the fact that certain white faculty members received a merit raise while he did not.

Of course, dissimilar treatment of similarly situated employees is an accepted method of proving a Title VII violation.  *See Nieto v. L&H Packing Co.,* 108 F.3d 621, 623 n.5 (5th Cir. 1997).  In order to raise an inference of discrimination, however, the plaintiff-employee must show "nearly identical" circumstances for employees to be considered similarly situated.  *See Berquist v. Washington Mut. Bank,* 500 F.3d 344, 353 (5th Cir. 2007), *cert. denied,* 2008 U.S. LEXIS 1199 (Jan. 22, 2008); *Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1090 (5th Cir. 1995); *Hockman v. Westward Communications, L.L.C.,* 282 F. Supp. 2d 512, 527-28 (E.D. Tex. 2003) (dismissing gender-based pay discrimination claim because comparators were not in "nearly identical circumstances" to plaintiff).

7

Green points to three white colleagues in his department, Victor Domino, Lloyd Dempster, and James Puckett, as comparators for the purpose of showing their preferential treatment in connection with the September 1, 2005 pay decision.   The relevant circumstances of each comparator may be summarized as follows:[10]

***Domino***:   Domino was hired in 1971 and became a full professor in 1985.   As of January 1, 2005, Domino was paid $68,575.88.   On September 1, 2005, Domino was given a constant raise of $750.00 and a merit raise of $1,522.07, a total adjustment of $2,272.07. Domino's mean annual evaluation score was 6.693.

***Dempster***:   Dempster was hired in 1988 and became a full professor in 2000.   As of January 1, 2005, Dempster was paid $55,363.88.   On September 1, 2005, Dempster was given a constant raise of $750.00 and a merit raise of $822.27, a total adjustment of $1,572.27.   Dempster's mean annual evaluation score was 6.2.

***Puckett***:   Puckett was hired in 1991 and became a full professor in 2000.   As of January 1, 2005, Puckett was paid $58,480.88.   On September 1, 2005, Puckett was given a constant raise of $750.00 and a merit raise of $349.90, a total adjustment of $1,099.90. Puckett's mean annual evaluation score was 6.

***Green***:   Green was hired in 1972 and became a full professor in 1999.   As of January 1, 2005, Green was paid $55,406.88.   On September 1, 2005, Green was given a constant raise of $750.00 and no merit raise.   Green's mean annual evaluation score was 5.465.

---

[10]     Defendant's Ex. 16, at 1297.

As the summary shows, Green was not similarly situated to his three comparators in at least one vitally important category — his mean annual evaluation score.  All three comparators scored at least 6 or better, while Green's score was only 5.465; indeed Green's score was the lowest in the entire department.[11]  This difference in score is critical, because it is uncontested that the University relies on these scores in making merit raise determinations.[12]

Green does not challenge the University's reliance on annual evaluation scores to determine merit raises, nor does he dispute that his mean annual evaluation score was lower than his comparators.  He likewise makes no claim that the scores were incorrectly calculated, or that the underlying evaluations were infected with racial bias.  He does argue that he should not be penalized for failing to submit a 2004 annual performance report because he was in the midst of challenging his post-tenure review process at the time the report was due.  But in fact he was not penalized, because Puckett used only Green's 2002 and 2003 scores in calculating the average.  Even had a 2004 score been included, Green has not shown that his average score would have been high enough to qualify him for a piece of the department's merit bonus pie.

---

[11]     Defendant's Ex. 16.

[12]     Courts traditionally give deference to a university's academic decisions, within constitutionally-prescribed limits. *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003).  The Fifth Circuit has recognized that a decision regarding a teacher's academic performance lends itself poorly to judicial review.  *See Levi v. University of Texas at San Antonio*, 840 F.2d 277, 280 (5th Cir. 1988); *Travis v. Board of Regents of Univ. of Texas,* 122 F.3d 259, 264 (5th Cir. 1997) ("[M]easuring the value of academic work is sticky business").

In sum, Green's comparators are dissimilar to him in a critically important respect — their superior annual performance ratings. Because Green does not present any other evidence of bias beyond his subjective opinion – no statistics, no racist comments by supervisors or co-workers, no "me too" testimony from other employees – his claim of disparate treatment in the denial of the September 2005 merit raise cannot be sustained. *See Ross v. University of Texas at San Antonio*, 139 F.3d 521, 526-27 (5th Cir. 1998) (employee's conclusory evidence was insufficient to rebut the University's judgment that his performance justified lower pay).[13]

Apart from his merit raise claim, Green alleges that he was treated differently than a white colleague, Dr. Alvin Kay, who was also given a negative post-tenure review. Kay complained verbally to Dean Hy that her negative review was based on a miscalculation. Dean Hy conferred with Kay's department chair, who agreed there was a mathematical error and rescinded the negative review. Green complains that Kay was unfairly granted a verbal "appeal," while he was denied an appeal all together. Green's charge is neither material to the pay discrimination claim, nor supported by the summary judgment record.

---

[13]    Green also contends that the May 2004 negative assessment in his post-tenure review affected his pay because the development plan that resulted prohibited him from teaching intersession classes. But, as noted above, that restriction was lifted in March 2005. Therefore, there was no pay decision during the relevant time period (between May 26, 2005 and March 22, 2006) based on the negative assessment. Moreover, the record reflects that Green was indeed paid for intersession teaching in 2004, 2005, and 2006. Defendant's Ex. 4. Therefore, Green has not shown that the May 2004 negative assessment had any impact on his compensation, much less that it was racially motivated.

First of all, this "due process" claim is not properly before the court because it was not the subject of the EEOC charge on which this Title VII lawsuit is based.[14]  That charge is based solely on the alleged pay disparity.  Moreover, Green does not assert that his negative review is based on an error in calculating his scores; as noted above he fails to present any evidence that the negative review was in fact erroneous.  Finally, Green was not denied an appeal in the end.  Although Puckett did initially inform Green that his appeal was premature, the University revoked that ruling and granted his appeal.  In sum, the University's treatment of Kay does not support an inference that the University discriminated against Green.

**Conclusion and Recommendation**

For the reasons discussed above, the court finds that Green has failed to raise a genuine issue of material fact sufficient for a rational trier of fact to find in his favor.  Defendant's motion for summary judgment (Dkt. 31) should be granted and Green's case dismissed with prejudice.

The parties have ten days from service of this Memorandum and Recommendation to file written objections.  Failure to file timely objections will preclude appellate review of factual findings or legal conclusions, except for plain error.  *See* FED. R. CIV. P. 72.

---

[14]     *See supra* n.6.

Signed at Houston, Texas on February 14, 2008.


Stephen Wm Smith
United States Magistrate Judge